# In the United States District Court for the Western District of Texas

| | | |
|---|---|---|
| ANDRES HOLDING CORPORATION | § § § | |
| Plaintiff | § § § | |
| v. | § | Civil Action No. SA-09-CA-127-XR |
| VILLAJE DEL RIO, LTD., et al. | § § § § | |
| Defendants | § | |

**ORDER**

On this date the Court considered Plaintiff's motion to compel arbitration (docket no. 9) and Defendants' response thereto. Plaintiff moves to compel Defendants George Geis and Villaje Management, LLC to binding arbitration. For the reasons discussed below, the Court DENIES the motion.

**Background**

On or about February 13, 2003, Plaintiff Andres Holding Corporation ("Andres") and Defendant Villaje del Rio, Ltd. ("VDR") executed a Construction Contract – Cost Plus (the "Contract"), pursuant to which Andres agreed to serve as the general contractor for the construction of the multi-million dollar residential, commercial, and retail development outside of downtown San Antonio known as the Villaje del Rio project (the "Project"). VDR was the owner

of the Project. The other Defendants in this action are Villaje Management, LLC ("VM"), the general partner of VDR, and George Geis, VM's sole shareholder.

Following a number of disputes regarding the construction of and payment for the Project, VDR terminated Andres as the Project's general contractor on or about October 26, 2004. On October 29, 2004, VDR filed a demand for arbitration with the American Arbitration Association ("AAA") under the Construction Industry Arbitration Rules. VDR's demand for arbitration was made pursuant to Article 1 of the Contract, which specifically incorporated the "current [1997] edition of AIA Document A201, 'General Conditions of the Contract for Construction.'" As set forth in section 4.6 of the AIA's "General Conditions," the parties to the Contract agreed to submit any disputes to binding arbitration. On or about November 4, 2004, Andres filed its own amended demand for arbitration with the AAA, which the AAA docketed as a counterclaim to VDR's demand. Andres made claims against each of VDR, VM, and Geis seeking the recovery of more than $2,960,000.[1] According to Andres, the arbitration was then delayed for years by a myriad of factors, including VDR's bankruptcy action and the corresponding stay, the parties' efforts to resolve a number of subcontractor claims prior to arbitrating their own disputes, and the necessity of selecting several alternate arbitrators following the disqualification of certain original arbitrators as a result of a conflict that arose during the pendency of the delayed arbitration.

---

[1] The case number for the claims pending in arbitration between and among Andres, on the one hand, and VDR, VM, and Geis, on the other hand, is 70 110 Y 00715 04.

In addition to the arbitration, Andres filed the present action in the 45th Judicial District Court of Bexar County, Texas. According to Andres, this action was originally filed to preserve its lien rights against the Project. Andres states that it amended the action to incorporate the totality of Andres's claims against VDR, VM, and Geis when – after more than three years without lodging an objection to arbitration – Geis first asserted that he and VM were not proper parties to the arbitration on the grounds that they were not signatories to the Contract in their individual capacities. After VDR declared bankruptcy, this proceeding was removed to the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, as Adversary Proceeding No. 08-05116. Recently, at Andres's request, the reference of this adversary proceeding to the bankruptcy court was withdrawn, and this lawsuit now sits before this Court.

Andres filed a motion with the AAA seeking to compel Geis and VM to arbitration on the grounds that any objection to arbitration was waived by their three year delay in resisting it. At the initial hearing on that motion in early 2009, one of the original arbitrators disclosed to the parties that his law firm had merged with the firm previously representing Geis in the various lawsuits arising from the Project, and another original arbitrator also disclosed certain relationships with Geis's prior attorney. Geis thus sought and obtained the disqualification of these two arbitrators, and the parties participated in a second round of arbitrator selection. When the new arbitration panel reconvened on June 10, 2009 to decide the question of its jurisdiction over Geis and VM, it deferred the arbitrability question to this Court.

Andres thus moves the Court for an order staying this case and compelling Geis and VM to arbitration. Neither VM nor Geis was a party to the construction contract. Nevertheless, Andres contends that arbitration should be compelled because: (a) Geis abused the corporate form of VDR and VM; (b) Geis and VM received benefits from Andres's performance of the Contract; and (c) Geis and VM waived their complaint about arbitration by remaining silent on this issue for approximately three years.

**Analysis**

The Federal Arbitration Act (FAA) generally provides that a written arbitration provision in any contract is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA further provides the Court with the power to compel a matter to arbitration where appropriate and to stay the matter pending in the district court until the conclusion of the related arbitration. *Id.* §§ 3, 4.

It is undisputed that neither Geis nor VM were signatories to the construction contract that contains the arbitration clause Andres seeks to enforce.

> Nevertheless, federal courts have held that so long as there is some written agreement to arbitrate, a third party may be bound to submit to arbitration. Carolyn B. Lamm & Jocelyn A. Aqua, Defining the Party-Who is a Proper Party in an International Arbitration Before the American Arbitration Association and Other International Institutions, 34 GEO. WASH. INT'L L. REV. 711, 720 (2003). Ordinary principles of contract and agency law may be called upon to bind a nonsignatory to an agreement whose terms have not clearly done so. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc*, 269 F.3d 187 (3d Cir.2001); *Thomson-C.S.F., S.A. v.*

4

> *American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995). Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary.

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355–56 (5th Cir. 2003) (footnote omitted). Andres argues for enforcement of the arbitration clause against Geis and VM under alter-ego, estoppel, and waiver theories.

**A. Alter-Ego**

Andres argues that the arbitration clause should be enforced against Geis and VM because VM and VDR were mere alter egos of Geis.

> Under the alter ego doctrine, a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms,"when their conduct demonstrates a virtual abandonment of separateness." *Thomson-C.S.F.*, 64 F.3d at 777....
>
> This is not to say that the decision to apply the alter ego doctrine to bind a parent is made routinely. "Courts do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration." *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1461 (10th Cir. 1995). The corporate veil may be pierced to hold an alter ego liable for the commitments of its instrumentality only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *American Fuel Corp. v. Utah Energy Dev't Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997). *Accord First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629-30, 103 S. Ct. 2591, 77 L. Ed.2d 46 (1983); *Gardemal v. Westin Hotel Co.*, 186 F.3d 588 (5th Cir. 1999). *Cf. Matter of Sims*, 994 F.2d 210 (5th Cir. 1993) (holding that an element of fraud must be present before courts will pierce the corporate veil in a case based upon a contract).

*Bridas S.A.P.I.C.*, 345 F.3d at 358–59. A district court should consider "those factors normally explored in the context of parent-subsidiary alter ego claims,"

including whether:

(1) the parent and subsidiary have common stock ownership;

(2) the parent and subsidiary have common directors or officers;

(3) the parent and subsidiary have common business departments;

(4) the parent and subsidiary file consolidated financial statements;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operated with grossly inadequate capital;

(8) the parent pays salaries and other expenses of subsidiary;

(9) the subsidiary receives no business except that given by the parent;

(10) the parent uses the subsidiary's property as its own;

(11) the daily operations of the two corporations are not kept separate;

(12) the subsidiary does not observe corporate formalities;

(13) the directors of the "subsidiary" act in the primary and independent interest of the "parent";

(14) others pay or guarantee debts of the dominated corporation; and

(15) whether the alleged dominator deals with the dominated corporation at arms length.

*Id.* at 360 n.11.

Andres submitted evidence that Geis created VDR, set up VM as the general partner of VDR, and is the sole manager and shareholder of VM. Defendants do not dispute these facts. Andres further *alleges* that Geis

exercised total control over VDR's and VM's involvement in the Project, used other entities to exercise control over architectural duties related to the Project, was integrally involved in day-to-day operations at the Project, regularly communicated with Andres's subcontractors regarding the Project's construction, and exercised "near unilateral dominion over the monthly pay application process." In sum, Andres alleges that "the actions of VDR and VM at issue in the arbitration were the actions of Geis himself." Andres, however, failed to provide any evidence to support these assertions. Andres thus established merely that Geis owned VM, the general partner of VDR, who was a signatory to the contract that contains the arbitration clause. Without further proof as to the other factors, the Court cannot conclude that Geis and/or VM should be bound by the arbitration clause as alter-egos of VDR. *See, e.g.*, *In re Trammel*, 246 S.W.3d 815, 820 (Tex. App.–Dallas 2008, no pet.) ("[A] corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement.").[2]

## B. Estoppel/Direct Benefits

Andres further argues that Geis and VM should be compelled to arbitration because they have sought to obtain substantial benefits from the construction contract.

> Under "direct benefits estoppel," a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes. Thus, a non-signatory plaintiff may be compelled

---

[2] Moreover, Andres neither alleges nor proves that Geis's or VM's "control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bridas S.A.P.I.C.*, 345 F.3d at 358–59.

7

> to arbitrate if it seeks to enforce terms of a contract containing an arbitration provision. For example, if a non-signatory's breach-of-warranty and breach-of-contract claims are based on certain terms of a written contract, then the non-signatory cannot avoid an arbitration provision within that contract. If, however, a non-signatory's claims can stand independently of the underlying contract, then arbitration generally should not be compelled under this theory.

*In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739-40 (Tex. 2005) (citations omitted).

Andres argues that the direct benefits theory applies to estop Geis and VM from objecting to the application of the arbitration clause. Specifically, Andres argues that Geis treated VDR and VM as his own alter ego, controlled or sought to control the entire construction of the Project, sent out daily missives to Andres instructing it as to his own specifications for the Project's construction, personally directed Andres and certain of its subcontractors regarding the means and details of their work, and personally engaged in extensive settlement negotiations with Andres, the Project's lender, and the Project's guarantor. Further, Andres alleges that any benefits from Geis's actions with respect to the construction contract would directly inure to Geis, as the individual with sole financial and corporate control over VDR and VM. Again, aside from producing documents indicating Geis's ownership of VM, the general partner of VDR, Andres provided no evidence to prove its allegations.

In this action, neither Geis nor VM has asserted a cause of action or otherwise taken a legal position from which they seek to benefit from the terms of the contract. It is Andres, rather, who asserts breach of contract and other

8

claims which seek benefits under the terms of the contract. In a similar case, the Fifth Circuit has remarked that courts do not "seriously consider applying direct benefits estoppel" in these situations. *Bridas*, 345 F.3d at 362.

Nevertheless, the direct benefits estoppel theory has been expanded to include parties who "seek and obtain direct benefits from a contract by means other than a lawsuit." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005).

> In some cases, a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract itself. The analysis here focuses on the nonparty's conduct during the performance of the contract. Thus, for example, a firm that uses a trade name pursuant to an agreement containing an arbitration clause cannot later avoid arbitration by claiming to have been a nonparty. Nor can nonsignatories who received lower insurance rates and the ability to sail under the French flag due to a contract avoid the arbitration clause in that contract.

*Id.* at 132-33 (footnotes omitted); *see also Hellenic Invsest. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006) ("Direct-benefit estoppel 'involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'"). Yet, without evidence to the contrary, it appears that the bulk of Andres's allegations—including, for example, Geis's efforts in controlling the progress of construction—relates to Geis's performance, as VDR's agent, of VDR's *duties*, not Geis's pursuit or receipt, in his individual capacity, of *benefits* under the contract.

9

Andres also alleges that Geis, as the sole owner of VM, which is the general partner of VDR, stood to reap all benefits from the construction contract. Again, however, Andres has provided no actual evidence to demonstrate whether and the extent to which Geis stood to profit directly from the contract. By way of example, given the sparse record before the Court, it is possible that VDR would have retained all profits earned from performance of the contract for reinvestment in new projects.

Finally, Andres specifies no conduct on the part of VM that would suggest that VM sought or obtained benefits under the contract. For the foregoing reasons, the Court is without sufficient information from which it can conclude that VM and Geis are estopped from opposing arbitration.

**C. Waiver**

Finally, Andres argues that Geis and VM waived their right to object to arbitration by permitting the arbitration to proceed for more than three years before objecting to their inclusion in the arbitration. Andres cites no case law to suggest that Geis and VM's delay waived their right to object. Moreover, even though the arbitration has been pending for some time, the parties agree that the arbitration virtually stalled after Andres filed its amended counterclaim on November 4, 2004. Nevertheless, Geis and VM have never maintained that they were subject to the arbitration and in fact objected to the arbitration during their first appearance in the matter, made at a status conference held in 2009 at Andres's request.

Andres cites to Rule 8 of the Construction Industry Arbitration Rules,

which governs the parties' arbitration and states, "A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award." *See* Docket No. 9 at Exh. F. However, neither Geis nor VM has filed an answering statement to Andres's claim. Therefore, Rule 8 does not apply to waive Geis and VM's objections. Andres thus fails to set forth a valid reason for concluding that Geis and VM waived their right to object to arbitration.

## Conclusion

For the foregoing reasons, Andres's motion to compel arbitration (docket no. 9) is DENIED.

It is so ORDERED.

SIGNED this 24th day of July, 2009.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE