IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANDRES HOLDING CORPORATION, | § | |
| *Plaintiff*, | § | |
| v. | § | Civil Action No. SA-09-CV-127-XR |
| VILLAJE DEL RIO, LTD., ET AL., | § | |
| *Defendants*. | § | |
| | | |
| GEORGE GEIS, | § | |
| *Plaintiff*, | § | |
| v. | § | Civil Action No. SA-09-CV-268-XR |
| ANDRES HOLDING CORPORATION, | § | |
| *Defendant*. | § | |

**ORDER**

On this date, the Court considered George Geis' Motion to Dismiss Andres Holding Corporation's Third Amended Complaint (Docket Entry No. 100), Andres' Response (Docket Entry No. 101), and Geis' Reply (Docket Entry No. 103). In light of the following, the motion to dismiss is DENIED.

**Factual Background**

Defendant George Geis is the owner of the Rio Architects company, the design architect on a multi-million dollar residential, commercial, and retail development construction project known as the Villaje Del Rio Project ("the Project"). Geis later founded Defendant Villaje Management,

1

L.L.C. (VM), the general partner of Defendant Villaje Del Rio, Ltd. (VDR), which was created to develop and construct the Project. Geis financed the Project through a Deed of Trust Note ("the Note") provided by DB Berkshire Mortgage (DBBM). VDR entered into a Construction Contract - Cost Plus ("the Contract") on February 13, 2003 with Plaintiff Andres Holding, designating Andres Holding as the general contractor for the project.

The Contract and associated Project Manual provided that Andres was to submit monthly "Contractors Requisition" forms ("Pay Requisitions") in order to obtain payment. The amount of payment under each Pay Requisition was dependent on the percentage of completion of the project, calculated by Andres and based on the amounts provided in the Schedule of Values. Andres began submitting Pay Requisitions in April 2003.

After receiving a Pay Requisition, Geis would submit an Application for Insurance for Advance of Proceeds in order to receive funding from DBBM. DBBM would advance the proceeds and increase the amount owed by Geis on the Note. At times, advances were made directly to Andres. As of Pay Requisition number 11 on February 2, 2004, the advances were made to Alamo Title Company as Title Agent, and disbursed pursuant to the February 13, 2003 "Construction Loan Disbursement Agreement."

VDR terminated the Contract with Andres Holding in late October 2004. Disputes over performance, payment, and termination of the Contract give rise to these consolidated lawsuits.

**Procedural Background**

The VDR project has resulted in numerous lawsuits in both state and federal court. On October 29, 2004, VDR filed a demand for arbitration against Andres before the American Arbitration Association ("AAA"), and shortly thereafter, Andres filed counterclaims against

VDR, VM, and Geis. Due to a number of factors, the arbitration was delayed for several years. In October 25, 2005, Andres filed an action in the 45th District Court of Bexar County, Texas against VDR ("the state lawsuit"), and added Geis by filing its First Amended Petition on November 1, 2007. While Andres' state court lawsuit was pending, DBBM declared its loan to VDR in default. Colina del Rio, LP ("Colina") purchased the loan. Colina filed suit in the 408th Judicial District Court for Bexar County, Texas, asserting fraud and breach of contract claims against Geis ("the Colina lawsuit").[1]

On May 1, 2006, VDR filed a voluntary Chapter 11 petition, and the matter was later converted to a Chapter 7 liquidation. On May 2, 2007, Andres purchased all tort and non-tort claims that could have been asserted by VDR against Andres. Colina purchased all of VDR's claims "not sounding in tort" against Geis. On April 29, 2008, the bankruptcy court authorized an assignment of Chapter 5 bankruptcy claims against Andres, with 90% of the recovery from any lawsuit to go to Geis and the remaining 10% to the VDR bankruptcy estate. Geis then filed his Original Complaint and Incorporated Objection to Claim asserting claims of fraudulent transfer and conveyances against Andres under § 548 of the Bankruptcy Code and Chapter 24 of the Texas Business & Commercial Code.

On October 13, 2008, Geis removed Andres' state lawsuit to the bankruptcy court, the bankruptcy reference was withdrawn, and Case No. 09-CV-127 was filed in this Court.[2] Andres asserts fraud claims against VDR arising out of the construction contract, and breach of contract claims against Geis and VM under an alter ego theory. Geis then filed a separate action in this

---

[1] *See George Geis d/b/a Rio Architects v. Colina del Rio, LP*, No. 04-09-00465-CV (Tex. App.–San Antonio Jul. 21, 2010).

[2] Order Withdrawing Reference, Feb. 24, 2009 (Docket Entry No. 2).

Court against Andres, Case No. 09-CV-268, asserting claims that Andres received fraudulent transfers violating the Texas Uniform Fraudulent Transfer Act ("TUFTA"), and received payments for over-billing, double billing, and work that was not performed.[3]

VDR filed a motion to consolidate the two cases as well as a separate case filed by VDR against Colina and DBBM.[4] Andres filed a motion to compel Geis and VDR to the pending arbitration before the AAA.[5] On July 24, 2009, this Court denied Andres' motion to compel arbitration, consolidated cases No. 09-CV-127 and No. 09-CV-268, and denied VDR's motion to include its separate lawsuit against VDR and DBBM in the consolidation.[6] On September 30, 2010, this Court denied a motion by Andres for leave to amend its complaint based on the factual findings of the state court in the Colina lawsuit against Geis and VDR.[7]

All three parties filed motions for summary judgment,[8] and on March 8, 2011 the Court

---

[3]*See* Geis' Second Amended Complaint and Incorporated Objection to Claim, Dec. 30, 2009 (Docket Entry No. 29).

[4]Motion for Consolidation, Jun. 10, 2009 (Docket Entry No. 7).

[5]Motion to Compel Geis and VM to Arbitration, Jul. 6, 2009 (Docket Entry No. 9).

[6]Order Denying Motion to Compel Arbration, Jul. 24, 2009 (Docket Entry No. 15); Order Granting in Part and Denying in Part Motion to Consolidate Cases, Jul. 24, 2009 (Docket Entry No. 16). In Case No. 07-CV-947, VDR asserted claims against Colina and DBBM for tortious interference, economic coercion, and recovery under the Texas Uniform Fraudulent Transfer Act for DBBM's funding of the overpayments, double payments, and improper payments to Andres. The Court denied the motion for consolidation of that case, which was ultimately dismissed by stipulation of the parties. Order Dismissing Case with Prejudice, Nov. 30, 2009 (Case No. SA-07-CA-947, Docket Entry No. 120).

[7]Ord. on Pl.'s Mot. for Leave to File Am. Compl., Oct. 19, 2010 (Docket Entry No. 51).

[8]Geis' Mot. for Partial Summ. J., Oct. 29, 2010 (Docket Entry No. 54); Villaje's Mot. for Summ. J., Oct. 29, 2010 (Docket Entry No. 55); Andres' Mot. for Summ. J., Oct. 29, 2010 (Docket Entry No. 56).

issued a summary judgment order.[9] The Court granted summary judgment to Geis on Andres' fraud and fraudulent inducement claims for failure to plead with the requisite particularity. It also denied summary judgment on the issue of Geis' alter ego liability for VDR's actions, and on Andres' breach of contract claims and tortious interference claims, as those claims are not barred by the statute of limitations. Geis' objection to Andres' proof of claim (Claim No. 7) also remains pending as Geis did not file a motion for summary judgment on that claim. The Court denied summary judgment to Andres on Geis' fraudulent conveyance claims under TUFTA and the Bankruptcy Code.

On March 17, 2011, Andres filed a motion to amend its complaint to plead its fraud and fraudulent inducement claims with more particularity.[10] In a pre-trial conference held on March 31, 2011, the Court granted the motion and permitted Andres to file an amended complaint.[11]

Geis filed this motion to dismiss Andres' third amended complaint on April 19, 2011.[12] Andres filed a response on May 3, 2011,[13] and Geis filed a reply on May 17, 2011.[14] Although the motion is styled as a motion to dismiss the entire complaint, it challenges only the amended claims of fraud and fraudulent inducement.[10] Geis argues that Andres still fails to meet the requirements

---

[9] Ord. on Mots. For Summ. J., Mar. 8, 2011 (Docket Entry No. 76).

[10] Mot. to Am. Compl. or Alt. Mot. for Recons. of Summ. J. Ord., Mar. 17, 2011 (Docket Entry No. 78).

[11] Minutes of Civil Proceedings, Mar. 31, 2011 (Docket Entry No. 95).

[12] Geis' Mot. to Dismiss 3d Am. Compl., Apr. 19, 2011 (Docket Entry No. 100).

[13] Andres' Resp. to Geis' Mot. to Dismiss, May 3, 2011 (Docket Entry No. 101).

[14] Reply to Andres' Resp. to Geis' Mot. to Dismiss, May 17, 2011 (Docket Entry No. 103).

[10] *See* Mot. to Dismiss.

for pleading fraud with particularity as required by Fed. R. Civ. P. 9(b).[11]

The case is scheduled for a pre-trial conference on October 6, 2011, and jury selection and trial on October 17, 2011.[12]

**Legal Standard**

If a complaint fails to state a claim upon which relief can be granted, a court is entitled to dismiss the complaint as a matter of law. FED. R. CIV. P. 12(b)(6). In considering a motion to dismiss under 12(b)(6), all factual allegations from the complaint should be taken as true. *Fernandez-Montez v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Additionally, the facts are construed favorably to the plaintiff. *Id.* Courts may look only to the pleadings in determining whether a plaintiff has adequately stated a claim; consideration of information outside the pleadings converts the motion to one for summary judgment. FED. R. CIV. P. 12(d). To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations must be sufficient to "raise a right to relief above the speculative level." *Id.* A well-pleaded complaint can survive a motion to dismiss even if actual proof of the facts alleged is "improbable." *Id.* 556.

The Federal Rules require that a party plead "with particularity the circumstances constituting fraud. . ." FED. R. CIV. P. 9(b). A plaintiff must plead the "time, place and contents of the false representations, as well as the identity of the person making the representations and what [that person] obtained thereby." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)

---

[11]Mot. to Dismiss at 2.

[12]Am. Sched. Ord., Apr. 19, 2011 (Docket Entry No. 99).

(quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). Rule 9(b) requires that the pleading include the "who, what when, where, and how" of the alleged fraudulent statement. *Williams*, 112 F.3d at 179 (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 n.5 (5th Cir. 1994)). These requirements provide fair notice to the defendant of the plaintiff's claim, protect the defendant from harm to his reputation and goodwill, reduce strike suits, and prevent plaintiffs from "filing baseless claims and then attempting to discover unknown wrongs." *In re Baker Hughes Securities Litigation*, 136 F.Supp.2d 630, 637 (S.D. Tex. 2001) (citing *Melder*, 27 F.3d at 1100).

A plaintiff need only generally allege "[m]alice, intent, knowledge, and other conditions of [the defendant's] mind." FED. R. CIV. P. 9(b). Pleading scienter, however, requires "more than a simple allegation that a defendant had fraudulent intent"; the pleading must "set forth specific facts that support an inference of fraud." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (citing *Tuchman*, 14 F.3d at 1068); see also *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008). Fraudulent intent can be inferred by alleging facts that show the defendant's motive to commit the alleged fraud, or that identify circumstances that indicate conscious behavior on the part of the defendant. *Dorsey*, 540 F.3d at 339. Fraud may be pled based on information and belief if the facts are "peculiarly within the opposing party's knowledge." *Id*.

**Analysis**

**1. The Court's Prior Summary Judgment Order on Fraud Claims**

The Court granted summary judgment to Geis on the fraud claims as alleged in the second amended complaint, because the pleadings were insufficient to fulfill the "where", "when", and "how" of the alleged fraud. The second amended complaint generally alleged that some statements

were made at some time during the closing and prior thereto, but did not provide any particularity with regard to the form. The Court held that these allegations were not enough to put Geis "on notice as to which of [his] assertions are challenged." *Williams*, 112 F.3d at 180. The Court also held that Andres failed to meet the scienter pleading requirement. Andres merely stated that Geis made the statements "with the intent for Andres to rely" on them.[13] It alleged no facts to indicate that Geis consciously intended to induce Andres' conduct based on false statements. The complaint merely stated that at some point, Geis made certain representations of conditions, and at another point, the contract was signed which reflected different conditions. Andres alleged no facts with regard to Geis' state of mind that would separate Geis' statements from any comments or proposed promises made in the course of contract negotiation.

## 2. Additional Fraud Allegations in Third Amended Complaint

The prior version of Andres' complaint asserted its first fraud claim with the following allegations:

> The figures provided to HUD at the closing for the Project as the schedule of values for the construction of the Project were originally generated by George Geis. Andres agreed to go to closing with these values based on various representations made by Geis. Specifically, Geis assured Wade Andres at the closing that he understood that the figures in the schedule of values did not accurately reflect Andres' estimate of the costs to build the project on a line item basis. Geis further assured Wade Andres that he would change the schedule of values to reflect the actual estimated costs to build the project on the line item basis after the closing. . . Geis ultimately used the excuse that Andres was overdrawn as the justification for terminating Andres. . .[14]

In the most recent version of the complaint, Andres added that:

> Andres agreed to sign the Construction Contract at closing with these values

---

[13] Andres' 2d Am. Compl. 9, Jan. 4, 2010 (Docket Entry No. 31).

[14] *Id*.

> based on various representations made by Geis. . .Geis knew that Andres would not agree to sign the Construction Contract if Andres believed he would be bound to Geis's original budget numbers, so he intentionally and consciously induced Andres into signing the Construction Contract by promising that he would adjust the budget. Andres relied on this representation in agreeing to enter into the Construction Contract for the project. Andres would not have entered into the Construction Contract if he had known that Geis would try to hold Andres to Geis's budget numbers rather than the actual budget for the Project.[15]

The third amended complaint also specifies that "[a]fter construction had been underway for roughly a year, Geis took the position that Andres had to build the project to Geis' original schedule of values."[16]

The second amended complaint also alleged a second fraud claim, that "[a]t and prior to the closing, Geis assured Andres that he would enter" a side agreement to cover Andres' fee (i.e. Andres' profit) in accordance with standard practice because HUD will not ensure a general contractor's profit on a HUD-insured job.[17] Andres asserted that Geis "ultimately wrongfully terminated Andres as part of his scheme to avoid paying any profit to Andres."[18] With regard to this claim, the third amended complaint further alleges that "Geis signed a letter of engagement with Andres in October 2002 in which he agreed to pay Andres a 3.5% fee/profit."[19] It continues with even more detailed allegations:

> at the time of the February 2003 closing, Geis and Andres had not finalized a side agreement that would cover Andres's fee. Andres specifically asked Geis at the February 13, 2003 closing about the open issue of the fee/profit side agreement.

---

[15] 3d Am. Compl. at 9.

[16] *Id.*

[17] 2d Am. Compl. at 9.

[18] *Id.*

[19] 3d Am. Compl. at 10.

Geis assured Andres at the February 13, 2003 closing that he would sign a side agreement after the closing and pay Andres fee/profit on the job. Geis himself admits that this conversation took place at the closing.

Following closing, Geis further implemented his scheme to avoid paying Andres any fee. First, Geis strung Andres along for almost a year and a half without signing any side agreement or paying Andres any fee/profit on the job. Immediately following the closing, Geis's legal counsel, Joe Vives, and Andres corresponded over several months regarding the need to finalize the side agreement on the fee/profit (as well as to adjust the 2328 schedule of values as referenced above), but Geis never followed through on his commitment to sign the side agreement or pay Andres a fee/profit.

Over a year after the initial closing, Geis had still not signed a side agreement covering Andres's fee, had not paid Andres any fee/profit on the job and was denying that he ever agreed to pay Andres a fee in the first place writing on March 23, 2004 that "I [Geis] have never agreed to pay Andres a 3.5% construction fee." Geis admits that he knew this statement was false when he made it and that he was taking this position to gain leverage over Andres and to "hold the fee issue over Andres's head."[20]

Finally, the third amended complaint includes an additional fraud allegation, that:

Geis was discussing termination of Andres months in advance of [a June 2004 HUD meeting] with his friend Glenn Huddleston in the spring of 2004 and earlier with the lender's representative Cary Brownley in late 2003/early 2004. On information and belief, Geis was already planning to terminate Andres when he signed the Construction Fee Settlement Agreement on June 10, 2004, and he structured the Agreement so that his obligation to pay the fee/profit would be further delayed and he could avoid paying Andres any fee before he terminated Andres. . .Geis knew when he signed the Construction Fee Settlement Agreement that he intended to terminate Andres and he consciously misrepresented his intent to pay Andres a fee through the Construction Fee Settlement Agreement to induce Andres to continue working on the project so that Geis could buy himself time to eventually manufacture a reason to terminate Andres.[21]

With regard to scienter, Andres' new complaint further alleges that "Geis never had any intention of paying Andres any fee/profit on this project either at the February 2003 closing or at

---

[20]*Id.* at 10-11.

[21]*Id.* at 12.

10

the June 10, 2004 meeting" because he "wanted to be the general contractor on this project from day one."[22] It states that Geis "told Andres he would sign a side agreement and pay Andres a fee at the closing to induce Andres to sign the Construction Contract consciously knowing that his promise of payment of a fee was false as he had no intention of paying Andres a fee/profit on the job."[23] Finally, the complaint alleges that "Geis's motive in committing this fraud was to avoid payment of any fee and to ultimately facilitate Geis's attempt to take over the project as general contractor."[24]

### 3. Motion to Dismiss

#### A. Particularity of Allegations

Geis argues that the third amended complaint still fails to plead the "where", "when", and "how" of the alleged fraud with the requisite particularity.[25] As described above, in its third amended complaint, Andres has alleged significantly more detail about the alleged representations made with regard to both the 2328 schedule of values and the alleged side agreement for Andres' fees and profits.[26] In addition to allegations regarding Geis' statements at the closing in February 2003, Andres has also made particular allegations with regard to a letter of engagement signed with Geis in October 2002, and the execution of the Construction Fee

---

[22]*Id.* at 13.

[23]*Id.*

[24]*Id.*

[25]Mot. to Dismiss at 3-4.

[26]3d Am. Compl. at 10-13.

Settlement Agreement in June 2004.[27] The allegations are sufficient notice of the "where", "when", and "how" of the alleged fraud to put Geis "on notice as to which of [his] assertions are challenged." *Williams*, 112 F.3d at 180.

Geis also objects that Andres is "putting the cart before the horse" by conflating the issue of Geis' alter ego liability for VDR and the issue of Geis' alleged fraudulent misrepresentations.[28] He objects that Andres "repeatedly and misleadingly pleads that Mr. Geis entered [the] contracts individually" rather than "alleging facts that would give rise to alter ego liability by properly pleading the existence of entity contracts [entered by VDR], and then attempting to impose liability for [Geis] on those contracts."[29] The Court is not persuaded by this argument. Andres' complaint is not misleading. There is no dispute that Geis acted as VDR's representative throughout the course of the negotiations and contract performance. As such a representative, he was capable of making representations on behalf of VDR. The Court does not read Andres' complaint as alleging that Geis entered the alleged agreements and contracts with Andres as an individual, but rather that he made the representations on VDR's behalf.

Under Texas law, the corporate veil may be pierced in three circumstances: "(1) the corporation is the alter ego of its owners or shareholders, (2) the corporation is used for an illegal purpose, and (3) the corporation is used as a sham to perpetrate a fraud." *Fidelity & Deposit Co. of Maryland v. Commercial Cas. Consultants, Inc.*, 976 F.2d 272, 274-75 (5th Cir. 1992) (citing *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1131-32 (5th Cir. 1988); *Castleberry*

---

[27]*Id.*

[28]Mot. to Dismiss at 4.

[29]*Id.*

*v. Branscum*, 721 S.W.2d 270, 272-73 (Tex. 1986)). Although Geis argues that the fraud allegations are used to support the third theory, Andres' third amended complaint alleges a wholly separate theory and factual basis for the fraud it alleges as the basis of its alter ego claim.[30] Although the complaint notes that Geis' alleged "dishonesty of purpose and intent to deceive" are further discussed in the context of its fraud and fraudulent inducement claims,[31] they are not the only basis alleged, and this is not fatal to either set of claims.

**B. Scienter**

Geis also argues that the third amended complaint still fails to adequately plead scienter.[32] As described above, the third amended complaint contains significantly more detailed allegations with regard to Geis' motivations. Specifically, it alleges that Geis never intended to pay any fee or profit to Andres, and that from day one he sought to act as general contractor for the job rather than Andres.[34]

Geis again raises the "cart before the horse" argument in this context, arguing that Andres has included only allegations as to Geis' personal motivations and personal benefits, rather than those of VDR. Again, the Court is not persuaded by this argument. The motivations of a corporation can only be shown through evidence of its representative's actions and scienter.

---

[30] 3d Am. Compl. at 8-9. The complaint also alleges the first alter ego theory, which the Court specifically discussed in denying Geis' motion for summary judgment. Summ. J. Ord. at 8-14.

[31] 3d Am. Compl. at 9.

[32] Mot. to Dismiss at 4-6.

[34] Neither is the Court persuaded by Geis' argument that he was motivated by "the imminent Gulf War and concerns that the war might impact the availability of financing for the Project," as the alleged motivations are not mutually exclusive. *See* Mot. to Dismiss at 6.

13

Andres' argument regarding Geis' desire to be the general contractor on the project, combined with his and VDR's desire to maximize profits, permits the inference of fraud sufficient to survive a motion to dismiss.

Many of the allegations as to scienter in the third amended complaint are pled based on information and belief, because the facts and circumstances at issue are "peculiarly within [Geis'] knowledge." *Dorsey*, 540 F.3d at 339. The third amended complaint alleges sufficient facts and circumstances to allow a fact finder to infer conscious behavior and fraudulent motive. *Id.; Lovelace v. Software Spectrum, Inc.*, 78 F.3d at 1018. Accordingly, the allegations of scienter are sufficient to state claims of fraud and fraudulent inducement and to survive the motion to dismiss.

**Conclusion**

After granting summary judgment to Geis on the fraud and fraudulent inducement claims, the Court permitted Andres to amend its complaint to allege the claims with more particularity as required by Fed. R. Civ. P. 9(b). Andres has added sufficient additional detail with regard to both the scienter requirement and the "when", "where", and "how" of the alleged fraud to remedy the deficiencies identified in the Court's summary judgment order. The third amended complaint therefore contains sufficient allegations to state a claim of fraud and fraudulent inducement. Accordingly, Geis' motion to dismiss the third amended complaint (Docket Entry No. 101) is DENIED.

It is so ORDERED.

SIGNED this 8th day of August, 2011.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE